UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HARTFORD INSURANCE COMPANY,

                Plaintiff,

                                                Case Number 04-10314

v.

                                                <u>CONSOLIDATED CASES</u>

RICHARD MILLER, SR. and VIRGINIA
MILLER,

                Defendants.

-and-

RICHARD MILLER, SR., and VIRGINIA
MILLER,

                Plaintiffs,

                                                 Case Number 05-10092

v.

HARTFORD INSURANCE COMPANY,

                Defendant.

_____/

## OPINION AND ORDER GRANTING HARTFORD'S MOTIONS FOR PARTIAL DISMISSAL OR SUMMARY JUDGMENT, OVERRULING THE MILLERS' OBJECTIONS TO UMPIRE'S REPORT, AND ORDERING FURTHER PROCEEDINGS

      This matter is before the Court on the parties' respective responses to a show cause order

directing them to demonstrate why the umpire's award in this insurance case should not be adopted.

In addition, Hartford Insurance Company has filed a motion for partial dismissal of the plaintiffs'

claims alleging that the umpire's award, which concluded a statutory appraisal procedure, effectively

resolves most of the disputed issues raised in the Millers' complaint.

The action stems from a fire that occurred on March 23, 2004 at the defendant/counter-plaintiffs' (the Millers') home in Cheboygan, Michigan. The fire damaged the home and personal property; the Millers were covered under an insurance policy issued by the plaintiff/counter-defendant (Hartford); and a dispute arose over the value of the lost property covered by the insurance policy. Both Hartford and the Millers filed lawsuits in this court and the matters were consolidated. The parties invoked Michigan's statutory appraisal process referenced in the insurance policy, *see* Mich. Comp. Laws § 500.2833(m), to resolve the dispute over the amount payable under the policy to rebuild the home. The parties chose appraisers, and the Court selected an umpire. The appraisers submitted reports to the umpire, and ultimately the umpire selected a bid contained in the report submitted by the Millers' appraiser in the amount of $222,980. On September 19, 2005, the umpire in this case, Daniel White, completed a "Decision of Umpire" adopting an estimate of $222,980 as the fair cost of replacing the Miller's fire-damaged residence.

Mr. White did not file his decision immediately because the Millers raised several objections to the award. As explained more fully below, the Court directed the umpire to file the award and ordered the parties to show cause why it should not be adopted. In response, the Millers raise a host of arguments as to why the Court should set aside the umpire's award, most of which challenge the impartiality of Hartford's appraiser and the line items contained in various bids. Hartford contends that the Millers ignore the standard of review and the fact that the umpire selected a bid submitted from their chosen appraiser. Hartford also has filed a motion to dismiss the Millers' claims for attorney's fees and what it considers is an implicit claim of bad faith. The Court heard oral argument on April 20, 2006, and thereafter the parties submitted supplemental authority. The Court

now finds that the umpire's decision was not the product of fraud, bias, or manifest mistake. However, the umpire did not consider the line item of debris removal in making his award. Hartford claims in this Court that coverage is limited on this line item based on the policy's language, but Hartford submitted its claims to the appraisal process and has waived any coverage argument before this Court. The Court will overrule the Millers' objections, adjust the award to include the cost of debris removal, deny the request for attorney's fees because no specific statute authorizes them and a claim based on bad faith has not been recognized by the Michigan courts, and award the Millers statutory penalties because of Hartford's delay in paying the undisputed portion of the claim.

## I.

The defendants and counter-plaintiffs, Virginia and Richard Miller, Sr., own a home in Cheboygan County, Michigan. On March 23, 2004, their home and its contents were destroyed by fire. Thereafter, the Millers rebuilt their home, and during that period they submitted claims for loss to their insurance company, plaintiff and counter-defendant Hartford Insurance Company.

Hartford filed suit on November 17, 2004 seeking a declaration from this Court that it did not have to cover the Millers' claimed losses. It contended that it promptly paid the undisputed cash value of the structure as the company calculated that amount. The Millers also presented to Hartford an inventory of personal property damaged in the fire; however, Hartford notes that the inventory contained no information as to the age or purchase price of the items. Hartford stated that it notified the Millers by letter dated August 12, 2004 that it intended to inspect and inventory the premises. Hartford arrived at the site only to find that the house had been bulldozed and the contents of the home removed and destroyed. Hartford believes the Millers' actions constitute a breach of the insurance contract and dispute the Millers' estimates of the replacement cost of the property.

On February 15, 2005, the Millers filed an answer to Hartford's complaint along with a counterclaim and jury demand, as well as a complaint in the Cheboygan County, Michigan state court – subsequently removed by Hartford to this Court, which consolidated the cases – seeking to invoke the appraisal process. In their answer, the Millers state that Hartford did not promptly pay the undisputed portion of the actual cash value of the structure. They explained:

> The mortgage balance due when the payment was received on August 13, 2004 in the amount of $88,200.95. Plaintiff had a separate contractual obligation to pay the mortgage. Because Plaintiff did not pay timely, Defendant incurred unnecessary, additional interest expense for the five month period that Plaintiff delayed in making its partial payment. They incurred additional construction expense because the bulk of the construction has been forced to be completed in the Fall and Winter.

Ans. at ¶ 8.

The Millers further asserted that they provided a detailed itemization of the personal property claimed to be lost consisting of 2,597 items listed on the inventory, which included the age of the items. The Millers claim that they did not provide the purchase price of the items because the policy did not require that the Millers provide that information.

The Millers dispute that they breached the insurance contract by bulldozing the site and removing and destroying personal property. According to the Millers, they promptly provided a claim for the losses from the March 2004 fire to Hartford, which the company acknowledges. They state that Hartford had ample opportunity to inspect the home and contents prior to August 14, 2004. The Millers claim they preserved many of the damaged items in storage and those items still remain available to Hartford. Hartford, however, has not inspected those items or instructed the Millers as to their disposition. In addition, the Millers state that the fire marshal and Hartford's adjuster took photographs of the site. The Millers believe that Hartford's delay was unreasonable, and they had no choice but to begin reconstruction of their replacement home after waiting five months.

-4-

The Millers allege that Hartford breached the insurance contract because it did not fairly and reasonably investigate their claims for loss and it failed to timely pay the claim. Under Michigan law, Hartford was required to pay pursuant to the terms of the contract within thirty days after receipt of proof of loss. *See* Mich. Comp. Laws § 500.2836. The Millers state that they provided such proof and the amount of loss was not reasonably in dispute. They believe that they are entitled to twelve percent penalty interest as a result.

On June 16, 2006, this Court entered an order for the appointment of an umpire and for the parties to engage in an appraisal process contemplated both by the terms of the policy and Michigan law. Order for Appraisal (June 16, 2006) (dkt # 19). The applicable statute provides that each party is to select an appraiser; the two appraisers then would select an impartial umpire, and if unable to agree on an umpire, the Court selects one. The two appraisers then give their estimates, which determine the loss if they are in agreement, but if they cannot agree, they are to submit their differences to the umpire, and then a majority of the three determine the final amount of the loss. Mich. Comp. Laws § 500.2833(m). The parties agreed that this provision should govern the disputed amount owed by Hartford.

Pursuant to the statute and insurance policy, the Millers appointed Kenneth Arndt of Kenneth R. Arndt & Associates, Inc. in Gaylord, Michigan as their appraiser. Hartford appointed Bruce A. Christianson of Burton Brothers General Contractors, Inc. in Southfield, Michigan as its appraiser. Because the parties were unable to agree on an umpire, the Court appointed Daniel White, an attorney in Alpena, Michigan.

On September 12, 2005, Bruce Christianson completed his work as Hartford's appraiser. In a letter to the umpire, he explained that he could not reach agreement with the Millers' appraiser.

-5-

However, he obtained several estimates from Michigan builders.  The first was an April 12, 2004 estimate from Burton Brothers Building (Christianson's own company) placing the replacement cost at $207,088.42.  The second was an estimate by Construction by Cullhane that estimated the rebuilding costs at $229,000.  The third bid came from Eastwood Custom Homes, Inc. and stated a construction cost of $226,885.  Finally, a handwritten proposal from Huron Beach Builders, Inc. placed rebuilding costs at $200,051.57.  Christianson concluded that the rebuilding appraisal should be $207,088.42.

On September 14, 2005, Arndt completed his work.  In a letter to the umpire, he reported that he obtained bids from Alpine Homes in Gaylord, and Kowatch Builders in Gaylord.  Alpine provided a bid of $222,980.  Kowatch estimated it would cost $238,918.92 to replace the Millers' home.  A report attached to the letter indicated that Arndt believed the average of the two bids likely was the appropriate amount and arrived at the amount of $231,000, not including debris removal.

On September 19, 2005, umpire White completed his "decision of umpire." His decision reads:

> This is a residential fire loss case in which the sole remaining dispute is the cost to rebuild (from sub-floor up) the insureds' 2,340 square foot single story home.
>
> The appraisal provisions of the subject insurance policy have been invoked, and the parties have retained [Bruce Christianson and Kenneth Arndt].
> . . .
> The appraisers have met and exchanged information but have been unable to agree upon the actual cash value of the loss, i.e. the fair cost of replacing the residence.  Accordingly, I requested that each appraiser submit to me his appraisal report so that I could decide the matter.  Both appraisers have complied by submitting thorough, well-reasoned reports which are described in more detail below.

### Summary of Appraisal Reports

-6-

The appraisers have taken a common approach to the cost analysis by obtaining multiple estimates from qualified builders.

Mr. Christianson's report contains the following:

➢    His own estimate of $207,088.42.
➢    An estimate from Huron Beach Building, Inc. for $200,051.57.
➢    An estimate from Eastwood Custom Homes, Inc. of Traverse City for $226,885.
➢    An estimate from Construction by Cullhane of Johanesberg, MI for $229,000.

Mr. Christianson submits $207,088.42 as the final valuation.

Mr. Arndt's report contains the following:

➢    An estimate from Alpine Homes of Gaylord, MI in the amount of $222,980.
➢    An estimate from Kowatch Builders and Developers for $238,918.92

Mr. Arndt submits a final valuation of $231,000.

### Opinion

The parties are less than $24,000 apart. The mean of their respective conclusions is $219,000 (rounded). I note that three of the estimates submitted are within $10,000 of the mean: Alpine Builders for $222,980; Construction by Culhane for $229,000; and Eastwood Custom Homes for $226,885.

I further note that Alpine Homes of Gaylord ($222,980) is relatively close to the Millers' Cheboygan building site, appears to specialize in constructing homes of like quality, and stands ready to honor its estimate almost immediately.

**For these reasons I adopt the Alpine Homes estimate of $222,980 as my opinion of value in this case.**

Millers' Resp. to Show Cause Order (dkt # 44), Decision of Umpire (Exhibit not labeled).

Thereafter, the Millers made numerous objections to the umpire, necessitating an order from the Court. On October 13, the Court wrote:

In a telefaxed letter dated October 7, 2005, Mr. White indicated that he has not filed the final documentation of his award because he has received numerous objections

> from the Millers and is awaiting further direction from the Court.  Those objections
> include allegations that the Hartford's appraiser should be disqualified because of
> bias, the appraiser's submission to the umpire was defective, and that the umpire
> should have included interest in his analysis.  The Court believes that the objections
> should be addressed to the Court by appropriate motion practice.
>
> The Court held a telephone status conference on October 12, 2005 to address
> the parties' concerns.  After hearing from counsel and considering the umpire's
> letter, the Court finds that the umpire's decision with respect to the issue presented
> to him is complete and satisfies applicable statutory requirements.  *See* Mich. Comp.
> Laws § 500.2833(m).  The Court will therefore direct the umpire to file a signed,
> final award and direct the Millers to show cause in writing why the claims with
> respect to the issue presented to the umpire should not be dismissed.

Show Cause Order (Oct. 13, 2005) (dkt # 32).  On October 25, 2005, the umpire filed his award as

directed by the Court.  Hartford's appraiser, Bruce Christianson, signed off on the award as did the

umpire.  The award was $222,980, the amount bid by Alpine Homes.  Umpire Award (Oct. 25,

2005) (dkt # 34).

On November 28, 2005, the Millers filed a response to the show cause order reiterating the

objections they made to the umpire.  They claim that Bruce Christianson was biased, the bids he put

forth contained errors, and they did not have any sufficient opportunity to respond to the dishonest

presentation.  The Millers state that the umpire considered the wrong document from Huron

Builders.  They believe that the umpire should have conducted a hearing or solicited additional

information from the parties.  Finally, they contend that Hartford acted in bad faith and they are the

best source for information regarding the damaged structure and amount of loss.  The Millers request

that the Court order payment by Hartford for their structure loss claim of $231,000, plus interest in

the total amount of $18,211.80.  In the alternative, the Millers seek a hearing at which they would

present evidence and testimony supporting a higher amount.  They also note that the appraisal

process did not deal with their landscape damage claim and demolition cost claim, which are still

disputed by Hartford.

Hartford has filed a response in opposition.  It claims that the Millers overlook both the standard of review and the fact that the umpire selected a bid submitted by the appraiser chosen by the Millers.  Hartford also has filed a motion for partial dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(c).  Hartford asserts that attorney's fees are not available in this breach of contract suit and Michigan does not recognize a claim of "bad faith" as impliedly alleged by the Millers.  Hartford also claims that both debris removal costs and landscape replacement were included in the appraisals.  As for the former, Hartford invokes policy language suggesting that debris removal is limited to five percent of the policy limit, and the umpire's report set the limit of Hartford's liability at $222,980, so its liability for debris removal cannot exceed $11,149.  The Millers filed a somewhat responsive brief – they claimed they could tax attorney's fees as costs under Michigan law – and later filed a supplemental brief, without leave of court, appearing to abandon the idea that attorney's fees are appropriate but claiming the statutory penalty interest is appropriate.

## II.

The appraisal process challenged in this case is prescribed by Michigan statute, the provisions of which must be incorporated into the fire insurance policy.  The statute provides:

> Sec. 2833. (1) Each fire insurance policy issued or delivered in this state shall contain the following provisions:
>
> . . .
>
> (m) That if the insured and insurer fail to agree on the actual cash value or amount of the loss, either party may make a written demand that the amount of the loss or the actual cash value be set by appraisal. If either makes a written demand for appraisal, each party shall select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days after receipt of the written demand. The 2 appraisers shall then select a competent, impartial umpire. If the 2 appraisers are unable to agree upon an umpire within 15 days, the insured or insurer may ask a judge of the circuit court for the county in which the loss occurred or in which the

property is located to select an umpire. The appraisers shall then set the amount of the loss and actual cash value as to each item. If the appraisers submit a written report of an agreement to the insurer, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any 2 of these 3 shall set the amount of the loss. Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by the insured and the insurer.

Mich. Comp. Laws § 500.2833(m).

The Michigan Court of Appeals has explained that the statutory appraisal process is akin to common law arbitration agreement. *Auto-Owners Ins. Co. v. Kwaiser*, 190 Mich. App. 482, 486 476 N.W.2d 467, 469 (1991). It is a "substitute for judicial determination of a dispute concerning the amount of loss, which is a simple and inexpensive method for the prompt adjustment and settlement of the claims." *Ibid.* (internal quotations and citations omitted). Although the process is not subject to the strict standard of review associated with statutory arbitration, "[j]udicial review of the [umpire's] award is limited to instances of bad faith, fraud, misconduct, or manifest mistake." *Ibid.* (citing *Davis v. Nat'l Am. Ins. Co.*, 78 Mich. App. 225, 232, 259 N.W.2d 433 (1977)).

The umpire generally is limited to determining the amount of loss based on competing claims of the parties. As a result, "[m]atters of insurance coverage are . . . for a court and not for appraisers." *Ibid.* (citing *Safeco Ins. Co. of Am. v. Sharma*, 160 Cal. App. 3d 1060, 1063 (1984)). In fact, "[t]he appraisal process cannot legally settle coverage issues." *Id.* at 487, 259 N.W.2d at 469. "Where the parties cannot agree on coverage, a court is to determine coverage in a declaratory action before an appraisal of the damage to the property." *Id.* at 487, 259 N.W.2d at 470.

With the limited standard of review in mind, Michigan courts generally have followed summary judgment procedures. *See, e.g., Auto-Owners*, 190 Mich. App. at 482, 476 N.W.2d at 467. Those procedures require challenges to appraisal awards to include evidence establishing a genuine

-10-

issue of material fact as to the umpire's bad faith, or fraud, misconduct, or manifest mistake that infects the process. A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The Millers do not frame their analysis in terms of the appropriate standard of review. However, their arguments embody generally claims of bad faith, fraud, misconduct, and manifest mistake in the appraisal process. The Millers' main arguments focus on the conduct of Hartford's appraiser, Bruce Christianson. They insist that his report contains errors and misstatements. They contend that he is biased because his company contracts frequently with Hartford and Hartford and Burton Brothers currently are in litigation. The Millers claim that Christianson actually created four replacement-cost estimates for Hartford, but only submitted one, on the lower end, to the umpire.

-11-

### *Bids from companies other than Burton.*

It appears that the Millers believe that Christianson's bias led him to solicit favorable bids from other contractors that omitted key line items necessary to restore their house to its pre-loss condition.  In addition to taking issue with the bid Christianson submitted from his own firm, the Millers contend that the bid from Construction by Culhane did not include subfloor and foundation replacement cost.  Eastwood Custom Home's proposal included subfloor replacement but left out costs for a new foundation.  The Millers conclude that including these necessary costs would have increased the total bid amounts to over $240,000.

The Millers further argue that the bid from Huron Beach Building for $200,051.57 submitted by Christianson as part of his report to the umpire was erroneous. The owner of that company, George Sanford, has significant experience with the Millers' home and over twenty-five years experience building custom homes in the Cheboygan area.  He has constructed an addition for the Millers, remodeled their house in its entirety, repainted the house's exterior, and re-roofed the residence.  The Millers claim that the bid was based on what they told Sanford at the time: Hartford was willing to pay only $202,859.07 for demolition and construction.  They say that Sanford's proposal  would have produced a house of significantly lower quality than the one lost in the fire. On April 7, 2004, Sanford provided an estimate to the Millers of $283,350.81, which they claim was the appropriate amount.

The statute requires that an appraiser be a "competent, independent appraiser." Mich. Comp. Laws § 500.2833(m).  In *Auto-Owners Ins. Co. v. Allied Adjustors & Appraisers, Inc.*, 238 Mich. App. 394, 400-01, 605 N.W.2d 685, 690 (1999), the Michigan Court of Appeals considered a challenge to the independence of an appraiser.  In that case, the insureds hired Allied Adjustors to

adjust their losses.  Allied was unable to agree with Auto-Owners on the amount of loss and the

parties invoked the statutory appraisal process.  Auto-Owners argued that Allied could not be an

independent appraiser under the statutory scheme because it had adjusted the very same losses now

in dispute.  The court of appeals disagreed, explaining the concept of independence under the statute

as follows:

> The definition of "independent" is "[n]ot dependent; not subject to control,
> restriction, modification, or limitation from a given outside source." Black's Law
> Dictionary (6th ed.).  The definition of "impartial" is "[f]avoring neither;
> disinterested; treating all alike; unbiased; equitable, fair, and just." *Id.* The
> implication is that the independent appraiser may be biased toward the party who
> hires and pays him, as long as he retains the ability to base his recommendation on
> his own judgment. The umpire, in contrast, may not favor either party; he must serve
> only equity, fairness, and justice.
>
> Because "independent appraisers" may feel biased toward the party who
> hired them, this construction leaves intact the rule that appraisers are not disqualified
> from their appointments on the basis of having previously served as adjusters. . . .
> Further, the purpose of the statutory provision at issue is for the amount of any loss
> to be determined without the consumption of judicial resources. . . . To that end, the
> statutory scheme contemplates each party hiring its own expert, with an impartial
> umpire, paid for equally by the parties, to break any impasse. MCL 500.2833(1)(m);
> MSA 24.12833(1)(m). We believe that this construction, which comports with
> common sense and the dictionary definitions of the words at issue, also best
> accomplishes the purposes of the statute.

*Ibid.* (citations omitted).  The fact that Burton Brothers was at one time a paid consultant of Hartford

does not render Christianson biased under the statute.  The fact that Hartford and Burton Brothers

presently are engaged in litigation against each other would even seem to suggest that Christianson

would be biased *against* Hartford.

The Millers' contention that certain bids in the reports were somehow faulty because of

Christianson or other reasons is not well-founded.   As the Michigan courts have explained, "if a

party attacks an appraiser's impartiality, that party has the burden of proof to show prejudicial

-13-

misconduct." *Allied Adjustors*, 238 Mich. App. at 399, 605 N.W.2d at 688-90.  There is no evidence

that Christianson told Culhane to omit the subfloor and foundation costs or pressured Eastwood to

include the subfloor replacement, but omit the cost of replacing the foundation.  Although there is

evidence to suggest that Christianson submitted a bid from Huron that did not reflect what the

Millers believed the replacement cost should be and Huron at one point submitted a much higher

bid, Christianson was not responsible for the lower bid.  Further, he explained in his report why the

higher bid was not submitted:

> A cost summary which shows the base cost of $200,051.57 and then change orders
> and costs for building upgrades and enhancements.  These changes and
> enhancements were not in place a the time of the loss and would not reflect the true
> cost to restore the structure to its original condition.

Hartford Resp. to Show Cause Order (dkt # 43) Ex. 7, Christianson Letter (Sept. 12, 2005).

The law requires the Millers to make a showing of prejudice.  It is unclear, even assuming

the truth of their allegations, how they have been prejudiced.  The umpire *rejected* Hartford's bids

in their entirety.  Instead, he chose a proposal submitted by Arndt, the appraiser the Millers chose.

The Millers do not contend that Arndt was biased.  In fact, the Millers ask the Court to award the

amount contained in his report:

> Considering the methodologies and the quality and integrity of the participating
> individuals, we believe the value indication at the mid point between the two bids is
> reasonably supportable as a fair reimbursement without debris removal at:
>
> $231,000.00

Millers' Resp. to Show Cause Order (dkt # 44), Arndt Letter (Sept. 14, 2005).

The Millers contend that the amount the umpire chose, a bid submitted by the Millers'

appraiser in his report from Alpine, was advocated against by Arndt himself.  The Millers state the

$222,980 bid from Alpine was for an entry-level home, not at all like the one that was damaged.

This argument is best construed as a claim that the umpire's award should be set aside for manifest mistake, but it is not persuasive. If there was a mistake, it was not manifest. The Millers simply allege that Arndt disagreed with Alpine's proposal, but they do not cite record evidence in support. They may draw such an inference from the fact that Arndt recommended the average of the two bids from Alpine and Kowatch, as noted above. However, a close reading of Arndt's report dispels that inference.

> Both bids seem reasonable and were executed by responsible contractors. Mr. Katke's original bid did not include the lawn restoration and the wallpaper, which necessitated a minor adjustment which is reflected on his actual bid which contains a typographical error, reflected correctly in this analysis.
>
> We concluded that either contractor would reasonably respond to a construction assignment in the range presented, thus we find the arithmetic mean an appropriate measure of the total value in terms of reproduction cost for the stated improvements as of current time.

*Ibid.*

Any suggestion that the Millers were getting an entry-level home based on the bids appears to be rebutted by Ardnt's report as well. He fully described his methodology in obtaining bids:

> *Assignment*            This assignment is to develop a supported opinion of the reproduction cost of the Millers' home . . .
>
> *Description of improvement*    The destroyed improvements include a 2,340 square foot singly story, single family home built on a five block crawl space. The structure contains kitchen, great room with vaulted ceiling, dining area, three bedrooms (one used as an office), (1) two fixture bath, and (1) three fixture bath. The structure is Class D frame with wood siding exterior and asphalt shingle composition roof. The windows are double pane insulated glass, double hung. The home contains two wood stoves, both located on brick hearths over concrete sub-floor supports. One stove is built on a brick hearth, the other on an imitation brick hearth.

-15-

|  | Contract specifications and floor plan are included as Exhibit Plans And Specifications in this Report |
|---|---|
| . . . | |
| *Methodology* | The primary methodology for completing this assignment is the solicitation of bids from contractor who could and would be in a position to replace this structure and who have no knowledge of the circumstances of the bid, have no knowledge of the current property owners (the Millers), and have had no adverse dealing with the Hartford Insurance Company, either past of present. |
|  | The original bids were sent to five contractors, three in the Indian River/Cheboygan area, two in Gaylord, and one additional contractor who builds custom homes and commercial construction.  The last party was secured as a review appraiser, and that firm declined to participate once the circumstances of the assignment were shared with him.  The contractors in Cheboygan county who were contracted initially agreed to provide data, but the nature of the case, the property owners and the prior knowledge caused them to remove themselves prior to actually submitting a bid. |

*Ibid.*

To be sure, Ardnt did describe Alpine as building "essentially entry level homes in the Gaylord area."  *Ibid.*  However, there are no allegations that Alpine was not qualified to build a custom house such as the Millers' or could not follow the specifications that Arndt provided.  *See ibid.* (noting that "[b]oth contractors were provided with a set of building plans provided by the **owners** . . . . As far as we are able to tell, the specification provided in our written advice were the only ones relied upon by the contractors") (emphasis added).  Finally, the Millers do not take issue with Arndt's statement, quoted above, that he felt both contractors were responsible and reasonably could respond to the task.

-16-

The Millers claim that the umpire does not explain why he rejected Ardnt's recommended averaged valuation in favor of Alpine's bid. That contention is misplaced. The umpire did explain his decision, noting that three bids were within $10,000 of each other and that "Alpine Homes of Gaylord ($222,980) is relatively close to the Millers' Cheboygan building site, appears to specialize in constructing homes of like quality, and stands ready to honor its estimate almost immediately." Millers' Resp. to Show Cause Order (dkt # 44), Decision of Umpire (Exhibit not labeled). Therefore, the Court will not set aside the umpire's award based on bias or manifest mistake.

### *Bias and manifest mistake based on Burton Brothers multiple bids.*

The Millers suggest that the fact that Burton Brothers provided multiple bids in this case is evidence of manifest mistake or bias. Burton Brothers presented only one of its bids to the umpire, but actually prepared more than one. The following is a summary of the bids:

> B-1: $202, 859.07 - provided in May of 2004 by Hartford to the Millers  excludes "mobilization charges"
> B-2: $221,191.71 - includes replacement foundation and contractor overhead
> B-3: $189,931.05 - saves footings and subfloor, includes contractor profit,  plus unspecified "…travel and extra expense charges…"
> B-4: $207,088.42 - excludes foundation and subfloor replacement,  includes profit and overhead, was provided to the Umpire.

Millers' Resp. Br. to Show Cause Order (dkt 44) at 5. Bid B-4 ultimately was submitted to the umpire. The Millers cite to the deposition of Eldon Beltz, Hartford's adjustor, in support of their belief that Burton did not include a "mobilization charge," which would have increased estimate B-1 to between $218,459 and $229,859. Beltz testified:

> A.    Receive bid from Burton on rebuilding the structure which is 202,859 plus a mobilization charge if they are awarded the contract. Spoke with estimator. This bid of 202,859 is what a local contractor in Cheboygan area should charge for in their professional opinion."
> Q.    Now, is that a note that you placed in your electronic log?
> A.    Yeah.

-17-

Q.      And was it based on a communication that you had from Burton Brothers Construction?

A.      Probably.

Q.      And who at Burton Brothers would you have conversed with?

A.      Probably Terry Wilson or Bruce.

Q.      Bruce who?

A.      Christenson. Excuse me.

Q.      Okay. Do you recall at this time?

A.      No.

Q.      Did they say that they had contacted a local contractor to find out what they would charge actually?

A.      My understanding they did.

Q.      Okay. Did they identify the amount of the mobilization charge if they are awarded the contract?

A.      No.

Q.      Did you ask them?

A.      It was discussed as to what it was. It would probably be a job superintendent.

Q.      Did they say how much that would cost?

A.      I don't recall a number, but they indicated since they had a residence in Higgins Lake, there would be no housing or anything involved, so I assume it would probably be job superintendent, maybe 20 hours a week, make sure everybody's performing.

Q.      For how many weeks?

A.      That construction probably should have taken after -- when you could drive your first nail, probably six to seven months.

Q.      Okay. But 20 hours a week for 6 to 7 months?

A.      Probably.

Q.      For a job supervisor. Do you have an opinion as to what that job supervisor's hourly rate would be?

A.      Probably anywhere from 30 to 45 depending on what the person was.

Millers' Resp. Br., Beltz dep. at 44-46.

Presumably, the Millers believe that Burton has "low-balled" them, and that had the effect of shifting the bids toward the lower end of the spectrum. Despite the fact that there is no evidence to support such a presumption, the umpire did not choose a bid impacted by a mobilization charge. There does not appear to be any link between these bids and those of the other contractors, such as communication of the other bids to the contractors submitting bids to Arndt on behalf of the Millers.

-18-

Even if there were some sort of evidence to suggest bias, the umpire's award amount was not outside the range of the B-1 bid as corrected for the mobilization cost. The umpire chose $222,980, and Burton's bid, as corrected, would have been between $218,459 and $229,859. It does not appear there is any basis for setting aside the umpire's award based on a "mobilization charge."

The Millers next challenge the line items of bid B-4. They state that Burton Brothers should have included ten-percent overhead and profit, which would have increased that bid amount to $221,191. Finally, the Millers contend that bid B-3 contained a clause providing, "Note: If Burton Brothers General Contractors is contracted to perform this work, travel and extra expenses may occur." This information, by itself, does not suggest that there was a manifest mistake or bias. The umpire chose none of Hartford's bids. And the amount chosen by the umpire exceeded the corrected amount of estimate B-4.

### *Debris Removal*

The Millers claim that the cost of debris removal was not part of the umpire's decision. Hartford concedes that the umpire was supposed to determine the cost associated with debris removal. It asserts that it will not argue about whether the umpire included such costs. Rather, Hartford contends that following policy provisions govern:

ADDITIONAL COVERAGES

1.     Debris Removal. We will pay your reasonable expense for the removal of:
     a.     Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or
     b.     Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.
This expense is included in the limit of liability that applies to the damage property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

-19-

Hartford did not make the policy an exhibit, but the Court accepts counsel's representation as to the policy language.  It appears to the Court that the umpire did not consider the cost of debris removal in his decision.  He chose Alpine's bid submitted in Arndt's report.  That report contained a caveat "[t]his part of the report does not specifically address debris removal."  Millers' Resp. to Show Cause Order (dkt # 44), Arndt Letter (Sept. 14, 2005).  As a result, it seems that debris removal was not part of the specifications provided to Alpine.

Hartford contends that its liability for debris removal is limited to five percent of "the limit of liability that applies to the damage property," and the limit is that established by the umpire.  That argument defies the text of the policy itself, since it is plain that the reference to liability limit is intended to refer to the property damage liability limit on the policy declaration sheet.  Moreover, Hartford attempts to assert now for the first time a coverage defense, which as noted earlier is to be decided by the Court.  But under Michigan law, failure to assert a coverage issue may constitute waiver once the appraisal process begins.  *Angott v. Chubb Group Ins.*, 270 Mich. App. 465, 472, 717 N.W.2d 341, 347 (2006) (rejecting coverage claim, reasoning that "by indicating that the court should not be involved with the case and that the appraisal process was the only appropriate avenue for relief, defendant was necessarily conceding that there were no coverage issues to be judicially resolved. The issue of coverage under the policy was waived").  The Court holds, therefore, that Hartford may not seek a *post hoc* determination that debris removal costs are limited to five percent of the umpire's award – a question of whether the policy covers amounts beyond five percent.

The Court determines that debris removal and landscaping replacement was not included in the appraisal or the umpire's award.  The amount must be adjusted in accordance with the procedures outlined below.

-20-

### *Hearing*

The Millers insist that the umpire should have afforded them a hearing or more process before arriving at his award.  First, the Millers point to this Court's order appointing the umpire and directing the parties, at their request, to engage in the statutory appraisal process.  In that order, the Court wrote:

> The umpire may convene a meeting of the appraisers in person or by telephone, solicit input from the parties through their attorneys, or engage in any other procedures that he deems expedient for the resolution of the disputed items. However, the parties and their counsel shall have no *ex parte* contact with the umpire.

The Court's language on the procedure was not mandatory but rather permissive.  The umpire could have held a hearing, but nothing in the Court's order required a hearing.

Second, the Millers suggest that there is a common-law right to more process than they received.  They point to two cases from the 1920s.  *N. Assur. Co. of London v. Melinsky*, 237 Mich. 665, 213 N.W. 70 (1927). *Jacobs v. Schmidt*, 231 Mich. 200, 203 N.W. 845 (1925).  In *Jacobs*, the Michigan Supreme Court stated

> *Appraisal or Appraisement* – A valuation of, or an estimation of the value of, property; the valuation of goods and chattels or real estate by two persons of suitable qualifications, fair, impartial, and disinterested, having knowledge of the property to be appraised, and with intelligence to ascertain its value after inspection and inquiry on the subject.
> . . .
> Both parties should be permitted to be present and both should be permitted to present their respective contentions, and the orderly way required the presence of both sides at the same time. After plaintiff left the meeting, the appraisers considered and all of them tentatively agreed upon some of the elements going to make up the value of the stock, but not final decision was reached, and it was understood that both parties should be fully heard before a final appraisal was arrived at

*Jacobs*, 231 Mich. at 207-08, 203 N.W. at 848.

The applicability of *Jacobs* to this case is limited.  *Jacobs* involved the valuation of stock because the parties could not agree on a price at which the stock would be bought and sold.  The appraisal process in that case was commenced by the parties' arms-length agreement, not by the terms of an insurance policy and prescribed and regulated by statute.

In *Melenski*, the court reiterated that appraisers need to be independent, but that previous work with a party did not render the appraiser biased.  Thus, the proposition that these cases afford some right to process above what the umpire conducted here is misplaced.  The Millers appear to base their argument on some degree to the analogy the Michigan courts have drawn between common law arbitration and the appraisal process.  At least one Michigan court, however, has recognized the limitation of that analogy.  In *Frans v. Harleysville Lake States Ins. Co.*, 270 Mich. App. 201, 714 N.W.2d 671 (2006), the court of appeals reasoned:

> Michigan case law indicates, for the most part, that appraisal clauses such as the one before us today constitute common-law arbitration agreements.  We note that *Emmons*, *Kwaiser*, and *Davis, supra*, all discussed appraisals and common-law arbitration mainly in the context of analysis relative to the appropriate standard of review applicable to common-law arbitration as opposed to statutory arbitration.  The discussion of common-law arbitration in *Manausa* was cursory, with the Court simply noting that the arbitration statutes were not relevant when addressing an appraisal provision because the provision involved common-law arbitration.  Thus, these cases narrowly addressed application of common-law arbitration principles to disputes over appraisal provisions, and, importantly, they did not involve issues regarding whether such principles control where there is statutory language to the contrary.
> . . .
> "[W]hen common-law principles and clear statutory language conflict, the statute controls." *People v. Hock Shop, Inc.*, 261 Mich. App 521, 532, 681 N.W.2d 669 (2004).

*Id.* at 205-06, 714 N.W.2d at 673-74.

The statute in this case does not suggest that a hearing-type appraisal process is required.  *See* Mich. Comp. Laws § 500.2833(m).  Further, under Michigan law, "[n]othing will be read into

-22-

a clear statute that is not within the manifest intention of the Legislature as derived from the language of the statute itself, and courts may not speculate as to the probable intent of the Legislature beyond the language expressed in the statute." *Twentieth Century Fox Home Entm't, Inc. v. Dep't of Treas.*, 270 Mich. App. 539, 545, 716 N.W.2d 598, 602 (2006) (internal citations and quotation marks omitted). The Millers do not argue that the statute is ambiguous.

The Millers, in a supplemental brief filed without leave of court, argue that a recent Michigan case, *Miller v. Miller*, 474 Mich 27, 707 N.W.2d 341 (2005), requires a hearing or additional process in this case. However, *Miller* arose under the Domestic Relations Act, not the statutory appraisal process at issue here. The Domestic Relations Act provides for arbitration, not appraisal of loss, and includes statutory language suggesting that an adversary presentation – which the supreme court held need not approximate that of a trial in court but nonetheless required some sort of hearing – was necessary. *See id.* at 30-31, 707 N.W.2d at 345 (quoting the relevant statutory provisions: "if a party applies under this section, the court shall vacate an award under any of the following circumstances: . . . (d) The arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights"; "an arbitrator appointed under this chapter shall hear and make an award on each issue submitted for arbitration under the arbitration agreement subject to the provisions of the agreement"). This case by contrast does not involve a statutory arbitration scheme with a statutorily prescribed standard of review; it employs the standard of review from common law arbitration agreements. It appears that neither the case law nor the statute at issue in this case requires a hearing or process beyond which the umpire afforded the parties.

-23-

Finally, the Millers argue that *Arkin Distributing Co. v. American Insurance Co.*, 85 Mich. App. 359, 271 N.W.2d 430 (1978), involved a hearing under the statutory appraisal process that lasted several days and involved testimony of witnesses.  However, the court in that case (nor any other Michigan court) did not hold that a hearing was required.  Rather, the court merely suggested that the extensive hearing held in that case insulated the award from challenge on the basis of manifest mistake.

In sum, although the umpire could have held a hearing, he was not required to do so.  The Millers had the opportunity to select an appraiser, present bids to the umpire, and obtain review by this Court.  The umpire's job was specific: he was limited to determine loss and he solicited input in the form of reports from the appraisers.  The arguments the Millers sought to present to the umpire have been presented to the Court.  The umpire's decision likely should not be set aside on the basis of lack of process or hearing.

III.

Hartford argues that there is no set of facts that Millers could prove that would entitled them to attorney's fees or to recover on a claim of bad faith.  The Court agrees.

In *Burnside v. State Farm Fire and Cas. Co.*, 208 Mich. App. 422, 426-27, 528 N.W.2d 749, 752 (1995), the Michigan Court of Appeals stated the rule with respect to attorney's fees as follows:

> In Michigan, it is well-settled that the recovery of attorney fees is governed by the "American rule." . . . Under the American rule, attorney fees are generally not allowed, as either costs or damages, unless recovery is expressly authorized by statute, court rule, or a recognized exception. . . . Exceptions to the general rule are construed narrowly.

*Ibid.* (citations omitted).  The Millers cite Michigan Compiled Laws § 600.2405, but that provision offers little support.  It merely states that "[t]he following items may be taxed and awarded as costs

-24-

unless otherwise directed . . . (6) Any attorney fees authorized by statute or by court rule." The

Millers point to no authorizing statute or rule. The Millers also cite Michigan Compiled Laws §

600.2591, which allows an award of fees in frivolous cases. The Court does not find that Hartford's

position taken in this case is frivolous within the meaning of that legislation.

The Millers do not press their bad faith claim. Michigan law appears to preclude such a

claim in this case. *See Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 604, 374 N.W.2d 905

(1985); *Kewin v. Massachusetts Mut. Life Ins. Co.*, 409 Mich. 401, 423, 295 N.W.2d 50 (1980).

There is authority, however, for an award of statutory interest in this case. Michigan

Compiled Laws § 500.2006 provides:

> (1) A person must pay on a timely basis to its insured . . . the benefits provided under
> the terms of its policy, or, in the alternative, the person must pay to its insured . . .
> 12% interest, as provided in subsection (4), on claims not paid on a timely basis.
> Failure to pay claims on a timely basis or to pay interest on claims as provided in
> subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.
> . . .
> (3) An insurer shall specify in writing the materials that constitute a satisfactory
> proof of loss not later than 30 days after receipt of a claim unless the claim is settled
> within the 30 days. If proof of loss is not supplied as to the entire claim, the amount
> supported by proof of loss shall be considered paid on a timely basis if paid within
> 60 days after receipt of proof of loss by the insurer.
> (4) If benefits are not paid on a timely basis the benefits paid shall bear simple
> interest from a date 60 days after satisfactory proof of loss was received by the
> insurer at the rate of 12% per annum, if the claimant is the insured or an individual
> or entity directly entitled to benefits under the insured's contract of insurance. If the
> claimant is a third party tort claimant, then the benefits paid shall bear interest from
> a date 60 days after satisfactory proof of loss was received by the insurer at the rate
> of 12% per annum if the liability of the insurer for the claim is not reasonably in
> dispute, the insurer has refused payment in bad faith and the bad faith was
> determined by a court of law. . . .

Hartford argues, correctly, that the amount of the loss on the dwelling was in dispute and therefore

it was not obliged to pay the entire replacement cost before the amount was determined. However,

Hartford was in possession of appraisals for the dwelling replacement within a month of the fire, but

it did not make a partial payment for dwelling replacement until August 2004, over four months

later. In *Angott*, the court of appeals explained that "simply because a portion of an insurance claim

is reasonably in dispute, it does not mean that an award of penalty interest is altogether precluded."

*Angott*, 270 Mich. App. at 478, 717 N.W.2d at 350.  The Michigan court explained:

> Having found that at least a portion of plaintiff's claimed costs or damage, but not all,
> were reasonably in dispute, we conclude that plaintiff might nonetheless be entitled
> to some penalty interest despite the fact that certain aspects of the claim were in
> reasonable dispute. As mentioned above, it is abundantly clear from the record that
> defendant knew that some level of benefits were due under the insurance policy.

*Id.* at 480, 717 N.W.2d at 351.

Likewise, it is clear that some level of benefits were due the Millers well before the partial

payment in August 2004.  The precise amount cannot be determined from this record, however.  A

hearing or further motion practice will be required.

IV.

The Court concludes that the Millers' objections to the appraisal and umpire's decision lack

merit, except to the extent that the amounts debris removal and landscaping replacement were not

included in the award.  The Millers are not entitled to attorney's fees or damages for bad faith, but

they are entitled to penalty interest.

Accordingly, it is **ORDERED** that Hartford's motion for partial dismissal or summary

judgment [04-10314 dkt #28; 05-10092 dkt #22] is **GRANTED**.

It is further **ORDERED** that the Millers' motion addressing issues yet to be resolved by the

Court and showing cause why the umpire's determination should be rejected [04-10314 dkt #40; 05-

10092 dkt #34] is **DENIED IN PART**.

-26-

It is further **ORDERED** that the Millers' motion to correct service of e-filed documents [04-10314 dkt #44; 05-10092 dkt #38] is **GRANTED** and the Millers' filings are accepted.

It is further **ORDERED** that the parties shall meet and confer on or before **October 16, 2006** to discuss a resolution to the outstanding issues pertaining to debris removal cost reimbursement, landscape expense replacement, and statutory interest, and report to the court in a joint letter as to the status of these issues on or before **October 23, 2006**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: September 30, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 2, 2006.

s/Felicia M. Moses
FELICIA M. MOSES

-27-